JUSTICE SOLOMON, concurring.
I join with the majority's affirmance, but disagree with its reasoning. I agree that Churchill v. State, 378 N.J. Super. 471, 876 A.2d 311 (App. Div. 2005), applies to electronic forms of media. I also agree that the "article was entitled to the protection of the fair-report privilege." Ante at 244, 184 A.3d 461-62. I write separately to express my belief that the newest version of Adelman's blog post did not constitute a republication as a matter of law and that plaintiffs' claim is thus barred by the one-year statute of limitations for defamation claims. I would, therefore, affirm the judgment of the Appellate Division. See *473 Petro-Lubricant Testing Labs. v. Adelman, 447 N.J. Super. 391, 148 A.3d 441 (App. Div. 2016).
I.
As a starting point, I note that the majority has correctly defined what constitutes a republication.[1] Ante at 255-56, 184 A.3d at 468. Changes do not amount to republication unless there is a substantive or material alteration in the subsequent publication. See Atkinson v. McLaughlin, 462 F.Supp.2d 1038, 1055 (D.N.D. 2006). In the present case, the majority determined that changes further delineating the term "white supremacist" were material. I disagree.
**264 In Atkinson, the court differentiated between immaterial modifications and modifications amounting to a republication. Id. at 1054. Changes are immaterial if they are "unrelated to the defamatory material," ibid. (citing Firth v. State, 98 N.Y.2d 365, 747 N.Y.S.2d 69, 775 N.E.2d 463, 466 (2002) ), or are "mere[ ] technical" changes that modify the way in which information on the website is accessed, ibid. (citing Churchill, 378 N.J. Super. at 482-83, 876 A.2d 311 ). The majority acknowledges that a republication occurs "where substantive material is added to a website, and that material is related to defamatory material that is already posted." Davis v. Mitan (In re Davis), 347 B.R. 607, 612 (W.D. Ky. 2006) (emphasis added) (determining that "new material" added to the defendant's website "contained substantive information related to [the plaintiff] and, by reference, to [his] family" and therefore constituted a republication); see also Larue v. Brown, 235 Ariz. 440, 333 P.3d 767, 773 (App. 2014) (finding republication where defendant responded to readers' comments directly below original article and the responses "added to and altered the substance of the original material by providing additional information in response to a reader's questions, and re-urging the truth of the original articles"). Nevertheless, the majority determined that the term "white supremacist materials" designates materials distinct from those that are "anti-religion, anti-minority, anti-Jewish, anti-[C]atholic, anti-gay."
II.
The majority's determination that "white supremacist materials" are distinct from materials that are "anti-religion, anti-minority, anti-Jewish, anti-[C]atholic, anti-gay" is contrary to common parlance. The modifications specifying the kinds of rants that plaintiffs' employees were subjected to do no more than further define "white supremacist" by setting forth its subsets. I do not agree with the majority that setting forth subsets of white supremacist views in Adelman's later blog post further defamed Wintermute. See ante at 257-59, 184 A.3d at 469-70.
**265 Merriam-Webster's Dictionary defines a "white supremacist" as "a person who believes that the white race is inherently superior to other races and that white people should have control over people of other races." White Supremacist, Merriam-Webster, https://www.merriam-webster.com/dictionary/ white%20supremacist (last visited Apr. 6, 2018). While this traditional definition has clear roots in our country's history, the ideological underpinnings of the white supremacist movement have "broadened." See Nat'l Consortium for the Study of Terrorism & Responses to Terrorism, Key Concepts to Understand Violent White Supremacy 1 (Apr. 2017).
*474 "[T]he [white supremacist] movement has broadened its focus to include other ethnic and religious groups, including Latinos, Asians, Middle Easterners, Muslims, and Sikhs. They have also targeted individuals of different sexual and gender identities, such as gay/lesbian and transgendered individuals." Ibid.; see also Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 770, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) (Thomas, J., concurring) ("In Klan ceremony, the cross is a symbol of white supremacy and a tool for the intimidation and harassment of racial minorities, Catholics, Jews, Communists, and any other groups hated by the Klan."); United States v. White, 698 F.3d 1005, 1009, 1010 (7th Cir. 2012) (discussing postings by a white supremacist defendant of the personal information of a jury foreperson who convicted a fellow white supremacist, including the following: "gay Jewish [Juror A], who has a gay black lover and ties to professional antiracist groups"). Although an individual may not subscribe to the same exact views about each group targeted by white supremacists, the person's identity and label as a white supremacist does not change. In short, the language in Adelman's modification contains a widely held, well-supported understanding of the term "white supremacy"-"anti-religion, anti-minority, anti-Jewish, anti-[C]atholic, anti-gay."
III.
The language relied upon by the majority to conclude that Adelman's modification is a republication is, in fact, an indistinguishable **266 substitute. As such, I find no republication because the modifications, with which the majority takes issue, did not add additional information to the original post, see Davis, 347 B.R. at 612 ; Larue, 333 P.3d at 773, and did not substantively change its content as a matter of law, see Nester v. O'Donnell, 301 N.J. Super. 198, 210, 693 A.2d 1214 (App. Div. 1997) ("Whether a term is clear or ambiguous is ... a question of law." (ellipsis in original) (quoting Kaufman v. Provident Life & Cas. Ins. Co., 828 F.Supp. 275, 282 (D.N.J. 1992), aff'd, 993 F.2d 877 (3d Cir. 1993) ) ).
I therefore agree with the Appellate Division that any changes to the article were not substantive. A finding that the second blogpost was not a republication matters because it ends the case. Here, the majority is able to resort to the fair-report privilege. Without that, the majority's fine parsing of the term "white supremacist" would result in a trial on the merits. That can have a chilling effect on the media in defamation suits where the privilege is not available. When, as here, changes to a publication are not substantive and do not amount to a republication, a defamation claim should end without a jury trial. Thus, I respectfully concur in the judgment of the majority.

I posit that whether the author sought a new audience is a consideration, but is not determinative as to whether a republication occurred. Nevertheless, as the majority acknowledged, that issue is not before this Court. Ante at 255-56, 184 A.3d 468.